## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON

**JOHN JINK LYNCH,**

        **Plaintiff,**

**v.**                                 **Case No. 2:13-cv-01470**

**WEXFORD HEALTH SOURCES, INC.,**
**DR. EMIL DAMEFF, Physician,**
**DR. HOMA RASHID, Physician,**
**DR. PHILIP SHOAF, Physician,**
**SANDRA MAY, Physician Assistant, and**
**ANNA KINCAID, Health Services Administrator,**

        **Defendants.**

## PROPOSED FINDINGS AND RECOMMENDATION

This matter is assigned to the Honorable Thomas E. Johnston, Chief United States District Judge and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B). Pending before the court is the defendants' Motion for Summary Judgment (ECF No. 88).

## RELEVANT PROCEDURAL HISTORY

This matter is proceeding only on the plaintiff's Eighth Amendment claims against the above-named defendants. The Complaint alleges that the plaintiff, John Jink Lynch (hereinafter "Lynch") was previously diagnosed and treated for skin cancer on his nose, upper lip, face, temple and scalp, which he believed had returned. The Complaint further contends that Lynch has sensitive areas on his face, nose, forehead and temple due to cancer removal and "skin peel" procedures that left scars and exposed and

damaged nerve endings, which causes swelling, bleeding, and pain when he shaves. The Complaint further alleges that Lynch has a curvature of the spine and multiple bone spurs on his spine that leave him in great pain and cause difficulty with ambulation and sleep. (ECF No. 2 at 5-6).

In Count One of the Complaint, Lynch alleges that Wexford Health Sources, Inc. ("Wexford"), a Pennsylvania corporation serving as the contracted medical provider at MOCC, as a matter of custom or policy, authorized the deliberate indifference of its employees and agents to the plaintiff's and other inmates' serious medical needs in an effort to minimize costs under their contract "for profit first." (*Id.* at 9-10). In Count Two, Lynch alleges that, on or about September 27, 2011, Dr. Emil Dameff, a former Regional Medical Director for Wexford, rescinded his "Permanent Shave Slip" and required him to shave in accordance with prison policy, which caused him "unnecessary harm, pain and self-mutilation" due to his skin conditions. (*Id.* at 10).

In Counts Three and Four, Lynch alleges that Dr. Homa Rashid and Dr. Philip Shoaf, doctors who formerly served as Medical Directors for Wexford, refused to review his medical records to determine his serious medical needs; refused to refer him to specialists for diagnostic tests, evaluation, and treatment of skin cancer and bone spurs; refused to follow instructions of specialists following outside treatment; refused to ensure he had follow-up visits with such specialists; and refused him pain medication. (*Id.* at 10-12).

In Count Five, Lynch alleges that Sandra May, a Physicians' Assistant employed by Wexford, violated policies and procedures by refusing to refer him to see the Medical Director (Doctor) within a specified time and refused to prescribe him pain medication. (*Id.* at 12-13). In Count Six, Lynch alleges that Anna Kincaid, Wexford's former Health

Services Administrator, was aware of his complaints of non-treatment through her role in answering grievances, but refused to review his medical file, meet with him, or offer him any assistance. He further contends that Kincaid routinely interfered with the medical decisions of the Medical Director and refused to perform her duties and obligations pursuant to Wexford's contract. (*Id.* at 13).

Lynch seeks monetary damages, as well as injunctive relief in the form of "proper medical treatment," a permanent shave slip, compliance by MOCC and other West Virginia Division of Corrections ("WVDOC") members with state and federal laws governing the treatment of incarcerated persons, and an audit of Wexford's contract with the State of West Virginia. (*Id.* at 21).

Following a period for discovery, the defendants timely filed a Motion for Summary Judgment, with accompanying exhibits (ECF No. 88), and a Memorandum of Law in support thereof (ECF No. 89). Pursuant to the holding of *Roseboro v. Garrison,* 528 F .2d 309 (4th Cir. 1975), the *pro se* plaintiff was notified that he had a right and obligation to file a response to the motion for summary judgment filed by the defendants and could submit affidavits or statements subject to the penalties of perjury, exhibits, or other legal or factual material supporting his position in the case. (ECF No. 90). On December 28, 2017, the plaintiff filed his Brief in Response to the Defendants' Motion for Summary Judgment, with exhibits. (ECF No. 92). On January 12, 2018, the defendants filed a Reply Brief, and additional exhibits (ECF No. 94). This matter is ripe for adjudication.

## **STANDARD OF REVIEW**

In evaluating summary judgment motions, Rule 56(a) of the Federal Rules of Civil Procedure provides:

> A party may move for summary judgment, identifying each claim or defense
> — or the part of each claim or defense — on which summary judgment is
> sought. The court shall grant summary judgment if the movant shows there
> is no genuine dispute as to any material fact and the movant is entitled to
> judgment as a matter of law. The court should state on the record the
> reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a) (2010). Material facts are those necessary to establish the elements

of a party's cause of action. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Summary judgment is required when a party fails to make a showing sufficient

to establish an essential element of a claim. *Celotex,* 477 U.S. at 322-23. The moving

party has the burden of establishing that there is an absence of evidence to support the

nonmoving party's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Once the

moving party demonstrates such a lack of evidence, the non-moving party must go

beyond the pleadings and make a sufficient showing of facts presenting a genuine issue

for trial. *Id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574,

586-87 (1986). Accordingly, summary judgment will generally be granted unless a

reasonable jury could render a verdict for the non-moving party on the evidence

presented. *Anderson,* 477 U.S. at 247-48.

A court must not resolve disputed facts or weigh the evidence and may not make

determinations of credibility. *Russell v. Microdyne Corp., 65 F .3d* 1229, 1239 (4th Cir.

1995); *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing

the motion is entitled to have his or her version of the facts accepted as true and to have

all internal conflicts resolved in his or her favor. *Charbonnages de France v. Smith,* 597

F.2d 406, 414 (4th Cir. 1979). Inferences that are "drawn from the underlying facts . . .

must be viewed in the light most favorable to the party opposing the motion." *United

States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). However, the party opposing the motion

may not rely upon mere allegations or denials of the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Sprenkle v. Hartford Life Ins. Co.,* 84 F. Supp.2d 751 (N.D. W. Va. 2000).

## STATEMENT OF UNDISPUTED FACTS

Lynch's Complaint was filed on January 25, 2013. This statement of undisputed facts is taken from Lynch's medical records between January 25, 2011 and January 25, 2013, the two-year period pre-dating his Complaint. (ECF No. 94, Attachs. 1-3; ECF No. 16, Attachments, *passim*). Other evidence of record relied upon by the parties are Lynch's Affidavit accompanying his Complaint (ECF No. 2, Attach. 1), the summary of Lynch's medical treatment prepared on January 7, 2013 (ECF No. 92, Attach. 5), and Lynch's deposition testimony (ECF No. 92, Attach. 2).

According to his medical records, Lynch has a number of medical conditions and was seen at least annually in the prison's Chronic Care Clinic ("CCC"). He has a history of skin cancer dating back to approximately 1990. According to his Affidavit and related medical records, Lynch has had at least five different surgical procedures to remove skin cancers from his facial area, and he has been periodically evaluated by outside specialists for the recurrence thereof. In 2007, Dr. Stephen K. Milroy, a dermatologist in Charleston, West Virginia, recommended that the plaintiff have a dermatologic evaluation every six months to one year. (ECF No. 16, Attach. 1 at 1). Lynch's Affidavit further states that, in 2008, Dr. David Miller reviewed his x-rays and diagnosed him with bone spurs on his spine and stated that "something needed to be done." (ECF No. 2, Attach. 1). With respect to the operative time period of the Complaint, the following treatment was indicated in the medical records and/or from Lynch's deposition testimony:

On August 8, 2011, Lynch submitted a sick call request and was seen by a nurse. He complained about a scabbed area on the inside of his right nare (nostril) and wanted to see a doctor.  No drainage or bleeding was noted.  Lynch stated that he was concerned about cancer because of his history.  He stated that the scabbed area had been there for years and would heal up and come back again.  He was instructed not to pick at this area and was told that the area would be monitored for changes.  Lynch was also examined by a Physicians' Assistant ("PA") (who does not appear to be Sandra May) who noted that his "right nostril is excoriated, scabbed over lesion.  No bleeding noted."  The PA's assessment was mild cellulitis of right inner nostril.  He was prescribed antibiotic ointment and was told to follow up as needed.  (ECF No. 92, Attach. 5 at 1; ECF No. 95, Attach. 1 at 5).

On September 27, 2011, Lynch was seen by Dr. Dameff and he asked about a permanent shave pass.  Lynch asserted that, given his history of basal cell carcinoma in 1998, which was removed from his left temple, he could not shave.  On assessment, it was noted that the plaintiff had a 3.5 x 4 cm square area over his left temple which is scarred.  However, he had no lesions over the rest of his face and had a sculpted beard.  Dr. Dameff explained that there was no clinical indication or need for a shave pass because the scar was over Lynch's temple.  Thus, Dr. Dameff discontinued the shave pass.  (ECF No. 92, Attach. 5 at 1; ECF No. 94, Attach. 1 at 10).

When asked about Dr. Dameff's conduct during his deposition, Lynch testified, "He just called me up and took the shave slip from me" and "He called me up and he said, 'I'm canceling your shave slip as of now.'"  (ECF No. 92, Attach. 2 at 4 (p. 11 of dep.)).  Lynch testified that Dr. Dameff told him "You don't need any shave slip over this scar over your temple there."  However, as Lynch further asserted in his deposition, "that wasn't

6

the reason why I had a shave slip." (*Id.* at p. 12).  Lynch further testified:

Q.    Why was it issued in the first place?

A.    I have severe damage to this side of my lip here.  I lost every bit of the skin clear across here and then it moved back right here.  If you look real close, you can see.  If I shave, it bleeds.

Q.    Okay.  And you're pointing to the right side?

A.    Right.  Because I swell up real bad.  It swells up even up in my nose.

Q.    Okay.

A.    There's all kinds of photographs of this, you know.

Q.    Uh-huh.  Okay.  And so you associate that issue with the skin cancer?

A.    Oh yes.  That's what it was.

Q.    Okay.  All right.  What about – Anything else Dr. Dameff was involved in with your treatment, either for your skin cancer or your bone spurs?

A.    No.  He just called me in and when he walked in, he said, "As of now, your shave slip is canceled.  I'm canceling it."  And I said, "Well, look here."  I said, "I've got all of this," and he said, "I don't want to hear it."  He said, "Hey, I just told you, your shave slip is canceled and you can leave now."

(*Id.* at 4-5 (pp. 12 and 13 of dep.)).

On October 7, 2011, Lynch appeared for treatment in the CCC.  It was noted that he was taking Naproxen for chronic lumbago (lower back pain).  A 2009 x-ray of the L-S spine showed osteoarthritis.  A plan was put in place for osteoarthritis of L-S spine, which stated: "As ADLs [Activities of Daily Living] are not affected at this time, will discontinue Naproxen for no medical necessity."  Lynch was told to do range of motion exercises and to use moist heat.  He was instructed to follow up in the CCC in one year. (ECF No. 92, Attach. 5 at 3; ECF No. 94, Attach. 2 at 2).

On November 23, 2011 Lynch reported to nurse sick call complaining about his skin condition and the scarring around his mouth from a prior chemical reaction. He stated he had heat bumps all over his upper lip with swelling and bleeding. He also complained about pain from bone spurs on his back on his third vertebrae and the center of his back. He stated that the pain had worsened. He wanted to be evaluated for skin cancer and back pain. He presented to medical using a cane to assist with ambulation. His face was shaved that morning, with no severe irritation noted. He had a small discolored spot on his right jaw and left cheek near his eye. He was referred to PA sick call and MD sick call for evaluation of the spots and bone spurs. (ECF No. 92, Attach, 5 at 1; ECF No. 94, Attach. 2 at 5).

On November 28, 2011, Lynch was seen by PA-C Sandra May. He demanded to see the doctor to be referred to a dermatologist and to see a doctor about the bone spurs on his spine. He stated that he had been told that he would see a doctor, not a PA. On examination, PA-C May noted that he had a one-millimeter black lesion on the tip of his nose, and one flat, brown 0.5 centimeter lesion in right and left facies and neck. He was to be referred to the doctor for evaluation. However, his request for a shave slip was denied. (ECF No. 92, Attach. 5 at 1; ECF No. 94, Attach. 2 at 5).

On December 7, 2011, Lynch was examined by Dr. Homa Rashid, who noted that Lynch had excision of basal cell carcinoma ("BCC") on his upper lip in 1996, followed by dermabrasion by Dr. Milroy. Dr. Rashid recommended that Lynch be placed on observation at that time. Lynch was advised to avoid prolonged sun exposure and to apply sunscreen. Lynch wanted Naprosyn to treat pain from the bone spurs on his spine. He was educated about the adverse effects of long-term use of NSAID medication and was advised to only use such medication for the short-term, if needed. (ECF No. 92, Attach.

5 at 1-2; ECF No. 94, Attach. 5 at 6).

Lynch had an annual physical performed on January 23, 2012.  There are no details in that progress note concerning the relevant conditions.  (ECF No. 94, Attach. 2 at 6).

On April 25, 2012, Lynch appeared for nurse sick call and complained about areas on the right side of his nose and back left side of his head.  When he was told that the spots he complained about were not visible upon inspection, he got argumentative and stated that they go away and come back.  He was referred to PA sick call.  (ECF No. 92, Attach. 5 at 2; ECF No. 94, Attach. 2 at 6-7).

On May 1, 2012, Lynch was examined by PA-C May and complained about a lesion on his right ear and right side of his nose.  No changes were noted since his prior exam except spot comes and goes.  He also complained of a lesion the size of a nickel on his left scalp.  The areas were examined and measured.  The spot on his left scalp was diagnosed as "seborrhea keratosis."  Lynch demanded a referral to MD sick clinic for an outpatient exam.  Photographs of his lesions were placed in his chart.  He was referred to MD sick call for further assessment as requested.  (ECF No. 92, Attach. 5 at 2; ECF No. 94, Attach. 2 at 7).

On May 4, 2012, Lynch was evaluated by Dr. Phillip Shoaf, who stated that he would refer Lynch to see Dr. Milroy.  (ECF No. 92, Attach. 5 at 2; ECF No. 94, Attach. 2 at 7).  On May 8, 2012, Dr. Shoaf also evaluated Lynch concerning his back pain.  The doctor was to review his x-rays and Naproxen was prescribed "500 mg BID x 2 mo" [twice daily for two months].  (ECF No. 92, Attach. 5 at 3; ECF No. 94, Attach. 2 at 9-10).  An x-ray of Lynch's back was taken on May 9, 2012, at Dr. Shoaf's request, which indicated that Lynch had "increased thoracic kyphosis with diffuse degenerative change" and "mild osteophyte formation."  (ECF No. 16, Attach. 8 at 10).

9

On May 10, 2012, Doctor Shoaf discussed Lynch's multiple skin lesions and history of BCC in "Collegial" and he was given approval for Lynch to be seen by a dermatologist. (ECF No. 92, Attach. 5 at 2; ECF No. 94, Attach. 2 at 10). A referral request was completed for Lynch to be seen by Dr. Wood. (ECF No. 94, Attach. 3 at 3).

On May 11, 2012, Lynch was seen in nurse sick call where he complained that Naproxen was upsetting his stomach. He was prescribed Maalox per protocol and was referred to PA sick call. He was directed to notify medical if his symptoms worsened. (ECF No. 92, Attach. 5 at 3; ECF No. 94, Attach. 2 at 10).

On May 17, 2012, Lynch was seen in PA sick call by PA-C May, where he complained that Naproxen was causing bleeding due to too much aspirin in it. Thus, he refused to take it without Prevacid, Zantac, or some other antacid. PA-C May advised Lynch to take the Naproxen with food and noted that he was already in possession of Mylanta. He was also evaluated for hemorrhoids, but PA-C May found that no treatment was necessary at that time. His Naproxen was decreased to 500 milligrams once daily and he was told to return to the clinic as needed. (ECF No. 92, Attach. 5 at 3; ECF No. 94, Attach. 3 at 4).

On June 11, 2012, Lynch was again seen by Dr. Shoaf, at which time he discussed his shaving pass. Shoaf noted that Lynch had a short beard and stated that he had shaved on the 5th of the month. He told Dr. Shoaf about the prior chemical peel that caused the damage and sensitivity around his mouth, which is aggravated by chemicals. Dr. Shoaf again checked Lynch's lesions for Collegial and noted a 2.5 cm lesion on his scalp. (ECF No. 92, Attach. 5 at 2; ECF No. 94, Attach. 3 at 4).

On July 3, 2012, Lynch was taken out to be evaluated by Dr. William A. Wood, a plastic surgeon, regarding the lesions on his nose and right ear. Dr. Wood noted that

10

"[t]here is no obvious skin cancer at these areas or maybe something early but it is something I would recommend a 6 month followup on."  (ECF No. 94, Attach. 3 at 5).

On July 25, 2012, Dr. Shoaf requested that the medical records staff obtain a consult report from Lynch's recent visit with Dr. Wood, so that Shoaf could review the report and follow up with Lynch in two weeks.  The nurse scheduled the follow-up with Dr. Shoaf.  (ECF No. 92, Attach. 5 at 2; ECF No. 94, Attach. 3 at 7).

On July 31, 2012, Lynch was seen by Dr. Shoaf, and Dr. Wood's report was reviewed.  There was no suspected malignancy at that time.  (ECF No. 92, Attach. 5 at 2; ECF No. 94, Attach. 3 at 6-7).  Dr. Shoaf noted that the plastic surgeon would like to re-check in six months and noted that he would report this at Collegial review.  (*Id.*)

Lynch was again examined by Dr. Shoaf on August 22, 2012.  Dr. Shoaf noted that the tip of Lynch's nose and ears were clear and that he planned to recheck him again in two months.  (ECF No. 92, Attach. 5 at 2; ECF No. 94, Attach. 3 at 7).

On October 17, 2012, Lynch appeared for CCC with no complaints.  He stated that he was jogging and stretching to stay fit.  He was directed to follow up in six months (March 2013).  (ECF No. 92, Attach. 5 at 2; ECF No. 94, Attach. 3 at 10).

The synopsis of Lynch's medical treatment was completed by Donna Warden, Wexford's Health Services Administrator, on January 7, 2013, and Lynch filed his Complaint on January 23, 2013, before he was scheduled to return to the outside dermatologist/plastic surgeon concerning his skin condition or for CCC.[1]

---

[1] The records produced by Lynch, which post-date the filing of the Complaint, indicate that he was not seen again by an outside skin specialist until October 9, 2013, when he had a biopsy performed by Dr. Milroy. That referral was made by a Dr. Ray.  The biopsy report, which was completed by Dr. H. Nicholas Shamma, indicated that Lynch did have a BCC on his scalp at that time.  Lynch was subsequently treated by Dr. Abdella Bandak, who removed the scalp lesion and scraped two lesions on Lynch's nose on or about January 31, 2014.  (ECF No. 16, Attach. 1 at 6-9).  Additionally, Lynch's records indicate that Lynch had additional x-rays of his spine taken on October 21, 2013 and May 27, 2015.  (ECF No. 16, Attach. 8 at 1-2).

## ANALYSIS

In *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), the Supreme Court held that the Eighth Amendment to the Constitution "imposes duties on [prison] officials who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" This is a low standard. The Supreme Court emphasized that "[p]rison conditions may be 'restrictive and even harsh.'" *Id.*, at 833.

Moreover, to sustain an Eighth Amendment claim, a prisoner must show two things: (1) "the deprivation must be, objectively, 'sufficiently serious;'" that is, "denial of 'the minimal civilized measure of life's necessities;'" and (2) the prison official had a "sufficiently culpable state of mind;'" that is, a "deliberate indifference to inmate health or safety." *Id.*, at 834. (Citations omitted.) The Supreme Court rejected an argument that an objective test of deliberate indifference be established.

> We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.,* at 837.

"In order to state a cognizable claim for denial of medical care under the Eighth Amendment, an inmate must allege facts sufficient to demonstrate a deliberate indifference to a serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or

excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990); *see also Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986) (collecting cases). "Serious medical needs" are those which have been diagnosed by a physician as mandating treatment or that are so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Gaudreault v. Munic. of Salem, Mass.*, 923 F.2d 203, 208 (1st Cir. 1990).

> Deliberate indifference may be demonstrated by either actual intent or reckless disregard. *See Benson v. Cady*, 761 F.2d 335, 339 (7th Cir. 1985). A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position. *See id.* Nevertheless, mere negligence or malpractice does not violate the Eighth Amendment. *See Estelle*, 429 U.S. at 106.

*Miltie*r, 896 F.2d at 851-852.

The burden of demonstrating deliberate indifference to a serious medical need by correctional officials and health care providers is very high. It is well settled that:

> A medical need serious enough to give rise to a constitutional claim involves a condition that places the inmate at a substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment perpetuates severe pain. *See Farmer*, 511 U.S. at 832-35; *Sosebee v. Murphy*, 797 F.2d 182-83 (4th Cir. 1986); *Loe v. Armistead*, 582 F.2d 1291, 1296-97 (4th Cir. 1978).

*Rush v. VanDevander*, 2008 WL 495651 (W.D. Va., Feb. 21, 2008); *Banks v. Green Rock Correctional Center Medical Dept.*, 2007 WL 2903673 (W.D. Va., Oct. 3, 2007). For example, in *Sosebee*, the Fourth Circuit found that if prison guards were aware that a steak bone had pierced an inmate's esophagus, causing infection that resulted in the inmate's death, and the guards had intentionally abstained from seeking medical help, such conduct <u>might</u> establish deliberate indifference to a serious medical need.

In *Webster v. Jones*, 554 F.2d 1285 (4th Cir. 1977), the plaintiff, who had complained numerous times of eye problems and loss of vision, claimed that he was cursorily examined after his initial complaint, but never re-examined despite later complaints.  The doctor claimed that he examined Webster several times, but never diagnosed a medical problem with his eye.  *Id.* at 1286.  Subsequently, a specialist found that Webster's vision had deteriorated to 20/400 and that he suffered from a detached retina and iritis, and that his vision could not be restored.  *Id.*  The Fourth Circuit found that, even if the doctor had been negligent in failing to properly diagnose or treat Webster, negligence is not sufficient to demonstrate deliberate indifference to a serious medical need and, thus, Webster's allegations did not constitute a cognizable constitutional claim.  *See also, Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998).

Likewise, disagreements between a health care provider and the inmate over a diagnosis and the proper course of treatment are not sufficient to support a deliberate indifference claim, and questions of medical judgment are not subject to judicial review.  *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975).  As noted by the Fourth Circuit, an inmate is not entitled to unqualified access to health care and treatment may be limited to what is medically necessary and not "that which may be considered merely desirable" to the inmate.  *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977).

Because Wexford is a contracted medical provider for the WVDOC, a state agency with oversight of MOCC, the deliberate indifference standard is applicable to the conduct of Wexford and its employees.  *West v.* Atkins, 487 U.S. 42 (1998) (explaining that a private entity which contracts with the state to provide medical services acts "under color of state law").  However, "[a] private corporation is liable under § 1983 *only* when an

14

official policy or custom of the corporation causes the alleged deprivation of federal rights." *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999) (emphasis in original).

The defendants' Memorandum of Law in support of their Motion for Summary Judgment asserts that Lynch has not produced any evidence that creates a genuine issue of material fact to support a violation of his Eighth Amendment rights. Specifically, their Memorandum of Law asserts:

> Here, Plaintiff cannot proffer any evidence to create a genuine issue of material fact that the Defendants were subjectively deliberately indifferent to any of his medical needs. Plaintiff received treatment for the medical conditions which he complains were not treated properly. (Depo. J. Lynch, p. 19, lines 9-24, p. 34, lines 11-24, p. 35, line 1; Exhibit 3). Plaintiff is not a doctor and does not have any medical training. (Depo. J. Lynch, p. 7, lines 11-24, p. 8, lines 1-7). On the other hand, the Defendants adequately monitored Plaintiff's conditions; treated the conditions as they needed treated; and referred him to outside care as he needed it. (Exhibit 3). Thus, Plaintiff's uneducated opinion is the only evidence he can offer to rebut that the treatment provided was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier*, 896 F.2d at 851. The evidence that Plaintiff could proffer would not even support a negligence malpractice claim against the Defendants, let alone a claim for deliberate indifference. Plaintiff's self-serving statements and speculation is insufficient to create a genuine dispute in material fact so as to overcome a motion for summary judgment. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126 [4th Cir. 1987]; *Chafin v. State farm Fire and Casualty*, 2003 U.S. Dist. LEXIS 28746 (S.D. W.Va. 2003). Therefore, summary judgment is appropriate as a matter of law.

(ECF No. 89 at 5-6). The defendants further assert that, based on the evidence of record, "this is simply a disagreement on the course of treatment provided to Plaintiff. Plaintiff admits to being provided the treatment, but disagrees with the decisions made for his treatment." (*Id.* at 6).

Lynch's Response to the Motion for Summary Judgment largely disputes the accuracy of his deposition because the court reporter would not make the wholesale

changes or additions he wished to make to his testimony. (ECF No. 92 at 4-6). However, Lynch further asserts that there are genuine issues of material fact concerning his Eighth Amendment claims based on his unsupported assertion that the summary of treatment provided by the defendants (ECF No. 92, Attach. 5) is "incomplete" and was allegedly "deliberately created in a fashion to reflect only limited elements of the Plaintiff's medical history." (ECF No. 92 at 6-7). His Response further contends:

> Although (Exhibit 5) does incorrectly report various times that the Plaintiff was seen by various Wexford personnel, the creator of the document goes a long way not to mention the elements related to the Plaintiff's cancer, cancer removal, and the reoccurrence of the cancer due to refusal to treat and follow up, and refusal to follow the recommendations of specialists in those areas, in as great a detail as that which is given to unrelated factors such as the discussion that medical staff supposedly had with Plaintiff about avoiding the sun. Therefore, this document should not be given any weight at all, but even if some consideration is given to this content of (Exhibit 5), the information as proffered does very little to alter the weight and magnitude of the allegations offered by the Plaintiff.

(*Id.* at 7).

Lynch's Response further argues that his medical records clearly support a finding that he has serious medical needs which have been diagnosed and treated in some form by previous health care providers, including the removal and reoccurrence of skin cancer that has resulted in extremely sensitive and painful areas on his face, nose and temple, as well as a "skin peel" treatment, which left scars and exposed and damaged nerve endings. (*Id.* at 9). Lynch further contends that the curvature of his spine and multiple bone spurs thereon are "serious medical needs requiring treatment and medical intervention to alleviate serious pain and suffering." (*Id.*) His Response further asserts:

> Despite the fact that Plaintiff has submitted numerous "sick call requests" complaining of his serious medical needs, trying to get treatment, he has been met with deliberate indifference to his serious medical needs, due to Defendants['] refusal to act or treat, and when they do treat Plaintiff, in reality the[y] do very little, amounting to no treatment at all, and Plaintiff

16

has been left in constant pain and suffering due to the refusal to properly treat his medical problems. For treatment, Plaintiff most often is told by Medical Department staff that if he wants something for pain, he "can purchase it in the exchange." This is akin to punishing Plaintiff for seeking medical treatment for his serious medical needs.

Furthermore, in his complaint, the Plaintiff avers that numerous inmates at the MOCC facility have filed medical complaints on issues concerning failure to treat, to both the MOCC and Wexford administrations. Therefore, the Defendants can not say that they do not have previous knowledge of the ongoing problems noted herein above. Many inmates have literally died because of the abundant deliberate indifference exhibited by Wexford Health Sources, its staff, and many DOC employees such as the Defendants.

Factually, in the present matter the defendants go to great pains in their attempt to diminish the magnitude of Plaintiff's contention that he was left in severe pain and made to live with continued suffering by virtue of the Defendants' refusal to treat Plaintiff's ongoing serious medical conditions, which have been previously recognized and diagnosed by qualified medical experts.

(*Id.* at 9-10). Lynch further contends that "a reasonable jury could rationally find that Plaintiff suffered an objectively serious deprivation as a result of Defendants['] actions. A jury could also rationally find that Defendants were deliberately indifferent to that deprivation." (*Id.* at 10).

The defendants' Reply brief contends that "Plaintiff failed to offer any concrete evidence that the Defendants were deliberately indifferent to his serious medical needs. Plaintiff's brief is in essence a recitation of the allegations in his Complaint." (ECF No. 94 at 2). They further assert that Lynch fails to rely on any specific medical records and offers only his own, self-serving opinion that the medical treatment provided to him was insufficient. (*Id.* at 2-3). The Reply further contends:

Plaintiff attempts to dispute the synopsis attached as Exhibit 3 [or attached as Exhibit 5 to Lynch's response] as not accurately reflecting the treatment provided; however, a review of the actual medical records indicates that Plaintiff was provided adequate treatment for his medical complaints. See Medical Records, Exhibit 1. Thus, the Defendants have offered more than

17

> ample proof that show[s] there is no genuine dispute of material fact in regard to Plaintiff's claim of deliberate indifference and have offered more than ample proof that Plaintiff was provided sufficient medical treatment. Plaintiff, on the other hand, offers only speculation and self-serving opinions, without any concrete evidence in support of same. Therefore, Plaintiff has failed to carry his burden to defeat this Motion for Summary Judgment and thus, summary judgment should be entered in favor of all of the Defendants in regard to all claims asserted against them by Plaintiff.

(*Id.* at 4-5). The defendants further reiterate their contention that, at best, Lynch's arguments demonstrate his disagreement concerning the judgment of the medical providers as to what treatment was necessary. (*Id.* at 5).

The undersigned proposes that the presiding District Judge **FIND** that Lynch can establish that his skin and back conditions are serious medical needs sufficient to establish the objective prong of the deliberate indifference standard required to establish a violation of the Eighth Amendment. However, the undersigned will address the subjective prong of the deliberate indifference standard as to each defendant below.

### A.    The claims against Wexford Health Sources, Inc.

Taking the evidence of record in the light most favorable to Lynch, he has not demonstrated a genuine issue of material fact concerning the liability of Wexford Health Sources, Inc. herein. Quite simply, Lynch has offered no evidence to demonstrate an official policy or custom of Wexford that caused the alleged deprivation of his Eighth Amendment rights. He has offered nothing more than conclusory allegations that Wexford has repeatedly been deliberately indifferent to the serious medical needs of inmates at MOCC, which is insufficient to establish a genuine issue of material fact sufficient to establish an Eighth Amendment claim against Wexford. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that there is no genuine

issue of material fact, and that Wexford Health Sources, Inc. is entitled to judgment as a matter of law on Lynch's claims contained in the Complaint.

### B.    The claims against Anna Kincaid.

Similarly, Lynch has offered no evidence to demonstrate that Health Services Administrator Anna Kincaid was deliberately indifferent to his serious medical needs. Aside from Lynch's allegations in his Complaint, and his conclusory statement in his deposition that Kincaid would not meet with him, there is a complete absence of evidence concerning any conduct by Kincaid.  Moreover, there is no evidence of record to demonstrate Lynch's assertion that Kincaid served as a supervisor of the other defendants or any specific evidence to demonstrate that she in any way interfered with Lynch's treatment.  Consequently, the undersigned proposes that the presiding District Judge **FIND** that there is no genuine issue of material fact, and that Anna Kincaid is entitled to judgment as a matter of law on Lynch's claims contained in the Complaint.

### C.    The claims against defendants Rashid, Shoaf, May, and Dameff.

The undersigned will address the claims against these defendants based upon the specified serious medical need alleged.

<u>Treatment related to skin cancer</u>

The undisputed evidence of record demonstrates that, during the operative time period, Lynch was frequently seen in the medical department with respect to his complaints about the lesions on his face and head, and that he was ultimately referred to an outside plastic surgeon for evaluation and any necessary treatment.  Thus, the undersigned proposes that the presiding District Judge **FIND** that the undisputed evidence of record demonstrates that Lynch was being examined by the defendants with

respect to his concerns about skin cancer and that he was ultimately referred to an outside specialist, who determined that he did not have skin cancer at that time.

Lynch has failed to offer any actual evidence to demonstrate that the defendants acted with deliberate indifference to his serious medical needs and his allegations serve only to demonstrate a disagreement with the judgment of his medical providers concerning appropriate and necessary treatment. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that there is no genuine issue of material fact and these defendants are entitled to judgment as a matter of law on Lynch's Eighth Amendment claims based upon the treatment for his skin cancer.

<u>Treatment for back conditions</u>

Lynch further contends that the defendants failed to sufficiently treat his back conditions by failing to refer him to an outside specialist for evaluation or for an MRI of his back. The undisputed medical records demonstrate that Lynch was consistently seen by medical staff, had periodic x-rays, including an x-ray on May 9, 2012, and that he was prescribed pain medication (Naproxen or Naprosyn) at varying dosages for his back pain. While the medical records do not indicate any referral for outside treatment, Lynch has failed to establish that additional diagnostic or specialized treatment was medically necessary, and a claim that medical providers "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for liability under the Eighth Amendment." *Mathis v. Hughes*, No. 1:08-cv-00336, 2010 WL 3430523, *6 (MM.D. Ala. Aug. 2, 2010) (quoting *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995). The Fourth Circuit has recognized that the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical

*necessity* and not simply that which may be considered desirable." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977).

Lynch has failed to present any evidence which indicates that these defendants knew that the manner in which they treated his back pain, with a conservative approach of pain management with medication, created a substantial risk to his health and consciously disregarded that risk. Lynch's unsupported allegations demonstrate nothing more than a difference of opinion as to the medically acceptable or necessary course of treatment that does not rise to the level of deliberate indifference required to violate the Eighth Amendment. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that there is no genuine issue of material fact and these defendants are entitled to judgment as a matter of law on Lynch's Eighth Amendment claims based upon the treatment for his back conditions and pain.

<u>Denial of the permanent shaving slip</u>

Lynch further alleges that Dr. Dameff was deliberately indifferent to his serious medical needs when he cancelled Lynch's "Permanent Shaving Slip," (or "shave pass") which excused Lynch from the prison's shaving requirements, allegedly without reviewing Lynch's medical records or examining his skin condition. The undisputed evidence of record demonstrates that, on September 27, 2011, Dr. Dameff advised Lynch that "there was no clinical reason for the shave pass" because the scar from Lynch's prior skin cancer removal was on his temple and, thus, was not in an area that he shaved. Therefore, Dr. Dameff canceled his shave pass on that date.

Additional medical records indicate that, on November 23, 2011, Lynch was examined by a nurse who noted that his "face is shaved this morning" and there was "no severe irritation noted at this time." (ECF No. 94, Attach.2 at 5). Nonetheless, Lynch

requested an evaluation for a shave slip. Then, on November 28, 2011, PA-C May evaluated Lynch, but denied the shave slip. Lynch also brought the issue to Dr. Shoaf's attention on June 11, 2012, but nothing was done, and the pass continued to be denied. According to Lynch's deposition testimony, the shave slip was reinstituted at the direction of Dr. Milroy, his treating dermatologist, but no date is provided for when that occurred.

Lynch contends that the denial of the shave pass forced him to shave areas of his face with increased sensitivity and nerve damage, which caused swelling and bleeding when he shaved, and placed him in unnecessary pain. In his prior Memorandum Opinion and Order, the presiding District Judge noted that, if true, requiring Lynch to "exacerbate that condition in an undeniably painful way" would demonstrate deliberate indifference thereto. (ECF no. 18 at 17).

The defendants' motion documents do not specifically address this issue. However, based upon the evidence of record, including Lynch's deposition testimony and the medical records indicating that Lynch advised defendants Dameff, May, and Shoaf about the condition of the skin around his mouth and the swelling, bleeding, and pain caused by shaving that area, a reasonable factfinder could find that those defendants disregarded a substantial risk of increased pain and, thus were deliberately indifferent to Lynch's serious medical need as a result. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that there is a genuine issue of material fact concerning Lynch's Eighth Amendment claim against defendants Dameff, May and Shoaf concerning the denial of his shaving slip and that those defendants are not entitled to judgment as a matter of law on that claim.[2]

---

[2] In light of Lynch's deposition testimony indicating that his shaving slip has been reinstated, his request for injunctive relief on that basis appears to be moot. However, his claim for monetary damages against these defendants would still be viable.

22

## RECOMMENDATION

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the defendants' Motion for Summary Judgment (ECF No. 88) with respect to all claims against Wexford Health Sources, Inc. and Anna Kincaid, and with respect to the Eighth Amendment claims against defendants Dr. Homa Rashid, Dr. Emil Dameff, Sandra May, PA-C, and Dr. Phillip Shoaf concerning treatment of Lynch's skin cancer and back conditions.    However, it is further respectfully **RECOMMENDED** that the presiding District Judge **DENY** the Motion for Summary Judgment with respect to the Eighth Amendment claims for monetary damages against defendants Dameff, May, and Shoaf concerning the denial of his shaving slip.

The plaintiff is notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, Chief United States District Judge.   Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the plaintiff shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendation" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendation" to which objection is made, and the basis of such objection.   Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.   *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*,

727 F.2d 91 (4th Cir. 1984).  Copies of such objections shall be provided to Chief Judge Johnston.

The Clerk is directed to file this Proposed Findings and Recommendation, mail a copy of the same to the plaintiff, and transmit a copy to counsel of record.

August 17, 2018

Dwane L. Tinsley
United States Magistrate Judge